**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Plaintiff,

    v.

ALBERTSON'S LLC, f/k/a ALBERTSON'S, INC.

        Defendant.

---

**COMPLAINT and JURY TRIAL DEMAND**

---

**NATURE OF THE ACTION**

This is a public enforcement action to correct the unlawful employment practices of subjecting a class of individuals to retaliation for opposing unlawful discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.  This action seeks to provide appropriate relief to a class of individuals adversely affected by such practices.  Plaintiff, the U.S. Equal Employment Opportunity Commission ("EEOC"), contends Defendant, Albertson's LLC, f/k/a Albertson's, Inc. ("Albertson's" or "Defendant"), engaged in a pattern or practice of retaliating against a class of employees at its Distribution Center in Aurora, Colorado, for opposing Albertson's unlawful discriminatory employment practices in violation of Title VII and the Civil Rights Act of 1991.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to §§ 704, 706(f)(1), 706(f)(3), and 707 of Title VII, 42 U.S.C. §§ 2000e-3, 2000e-5(f)(1), 2000e-5(f)(3), and 2000e-6, and § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3.      Plaintiff EEOC is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, and is expressly authorized to bring this action by §§ 706(f)(1), 706(f)(3), and 707 of Title VII, 42 U.S.C. §§ 2000e-5(f)(1), 2000e-5(f)(3), and 2000e-6.

4.      Defendant Albertson's is a Delaware limited liability company.

5.      At all relevant times, Albertson's has continuously been doing business in the State of Colorado.

6.      At all relevant times, Albertson's has continuously had at least 15 employees.

7.      At all relevant times, Albertson's has continuously been an employer engaged in an industry affecting commerce within the meaning of §§ 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## STATEMENT OF CLAIMS

### General Allegations

8.      More than thirty days prior to the institution of this lawsuit, Jose Cortes ("Cortes"),

a former employee of Albertson's, filed a charge of discrimination with the EEOC on behalf of himself and other similarly situated employees alleging violations of Title VII by Albertson's.

9.    All conditions precedent to the institution of this lawsuit have been fulfilled.

10.    Cortes is Honduran.

11.    Cortes was employed by Albertson's as an Order Selector at Albertson's Distribution Center in Aurora, Colorado, from on or about May 16, 2000, until his discharge on or about April 13, 2006.

12.    During Cortes' tenure with Albertson's, Cortes was given less desirable and/or worse and/or more difficult work assignments than less senior White/Non-Hispanic employees, including but not limited to, Kevin Guthrie ("Guthrie").

13.    During Cortes' tenure with Albertson's, Cortes was not selected for jobs or training while less senior White/Non-Hispanic employees were, including but not limited to, Paul Davis and Eugene Vanderbilt.

14.    During Cortes' tenure with Albertson's, some transfers were not posted, and less senior White/Non-Hispanic employees were chosen for those positions, including Guthrie.

15.    During Cortes' tenure with Albertson's, Cortes and other class members were disciplined for, among other things, violations of Albertson's attendance policy while White/Non-Hispanic employees were not disciplined for the same or similar infractions or received lesser discipline, including but not limited to Bob Roach, Travis Burn, Tim Cook, and Ken McClutsky.

16.    Beginning in November 2003, Cortes complained repeatedly to Albertson's through union representatives, management, and Albertson's Hotline telephone number about disparate treatment by Albertson's.

3

17.    Cortes' last Hotline complaint was on or about February 28, 2006.

18.    On or about March 15, 2006, Cortes' complaint was referred to Katina Wood ("Wood") for investigation.

19.    On or about April 6, 2006, Wood contacted management at Albertson's Distribution Center.

20.    On or about April 13, 2006, one week later, Cortes was terminated.

21.    James Baxter ("Baxter") is Black.

22.    Baxter has been employed by Albertson's at Albertson's Distribution Center in Aurora, Colorado, since on or about September 1, 1989.

23.    Baxter is an Intervenor in *EEOC v. Albertson's*, Civil Action No. 06-cv-01273-WYD-BNB, U.S. District Court for the District of Colorado.

24.    The week after Baxter appeared in court for the first time, he was at work when his wife became ill at home.

25.    Baxter's daughter made three emergency telephone calls to the Distribution Center but was not allowed to speak with her father.

26.    Baxter's wife was hospitalized that day.

27.    Baxter's wife was in a diabetic coma for three days.

28.    Baxter missed only one day of work because of his otherwise scheduled days off.

29.    While his wife was still unconscious and in the hospital, Baxter went to the Distribution Center to request Family and Medical Leave Act ("FMLA") leave.

30.    Baxter was told by Warehouse Operations Superintendent James Zandstra to come back later in the day to obtain the forms from someone in Human Resources.

4

31.     Baxter returned later in the day and obtained the FMLA forms, one of which had to be completed by his wife's doctor.

32.     When Baxter returned to work, he was suspended by Warehouse Operations Supervisor Steve Dade for three days for having missed one day of work while his wife was in a coma.

33.     On or about June 7, 2007, Baxter sustained an on-the-job injury to his knee.

34.     Baxter was placed on temporary alternative work ("TAW"), also known as light duty.

35.     While on TAW, Baxter was assigned to pick up trash outside the Distribution Center, paint exterior walls, steps, guard rails, parking lot wheel blocks, guard posts, and the guard shack, scrub the shipping and receiving doors to remove hydraulic fluid, scrub the truck wash walls, and pull weeds along the driveway.

36.     The outdoor assignments were often given to Baxter on days when the temperature was around 100 degrees Fahrenheit.

37.     On these days, no one else was outside working in the heat.

38.     On or about July 18, 2007, Baxter became nauseous and was treated for heat exhaustion.

39.     Albertson's assigned Baxter to paint with toxic paint without providing him with the recommended safety equipment.

40.     As a result, Baxter was prescribed an inhaler to help him breathe.

41.     While on TAW, Baxter was never offered work in the office area or in salvage.

42.     Upon information and belief, Chad Socias ("Socias") is Hispanic.

43.     Socias was assigned light duty work in the receiving office and in salvage.

44.    Upon information and belief, Emilio Victoria ("Victoria") is Hispanic.

45.    Victoria was assigned light duty work in salvage and sweeping in the warehouse.

46.    Upon information and belief, Pete Vega ("Vega") is Hispanic.

47.    Vega was assigned light duty in salvage.

48.    On or about August 16, 2007, Dr. Mark Failinger ordered arthroscopic surgery to repair a meniscus tear in Baxter's knee.

49.    On or about August 28, 2007, at approximately 8:50 a.m., Warehouse Operations Manager Jim Hayes ("Hayes") taunted and laughed at Baxter while Baxter was picking up trash at the entrance to the Distribution Center parking lot.

50.    On or about September 4, 2007, at approximately 11:30 a.m., Hayes stuck his tongue out to taunt Baxter while Baxter was painting the exterior walls of the building.

51.    On or about September 6, 2007, at approximately lunch time, Hayes, an ex-police officer, made a gesture towards Baxter like he was pointing a gun, holding it with both hands, and shooting Baxter.

52.    On or about September 12, 2007, Dr. Tentori released Baxter back to regular duty.

53.    Dr. Failinger was surprised by Dr. Tentori releasing Baxter back to regular duty.

54.    Socias is not a member of the class of employees on whose behalf the EEOC is suing Albertson's in *EEOC v. Albertson's*, Civil Action No. 06-cv-01273-WYD-BNB, U.S. District Court for the District of Colorado.

55.    Socias was approved by Albertson's for shoulder surgery.

56.    On or about February 7, 2008, Albertson's issued Baxter a payahead check signed by General Manager Charles Miller ("Miller") for holiday pay that was not included in his regular

pay check.

57.     When Baxter attempted to cash the payahead check, payment was refused by Wachovia Bank.

58.     Wachovia Bank was the bank the check was drawn on.

59.     Joe Archuleta ("Archuleta") is Hispanic.

60.     Archuleta has been employed by Albertson's at Albertson's Distribution Center in Aurora, Colorado, since June 1989.

61.     Archuleta complained to his foreman about Hispanics being treated unfairly under Albertson's attendance policy.

62.     Thereafter, Archuleta was subjected to heightened scrutiny of his work by Maintenance Supervisor George Potter.

63.     Tia Renee Beacham ("Beacham") is Black.

64.     Beacham worked for Albertson's as a clerk at Albertson's Distribution Center from 1999 until 2000.

65.     Beacham heard her supervisor, Jim (last name unknown), tell the following racial joke: "What do you do when you see twelve monkeys hanging off the porch?  You hang them."

66.     Beacham was offended by the racial joke.

67.     Beacham received a black, stuffed, monkey doll from her supervisor, Jim (last name unknown).

68.     Beacham was offended.

69.     Beacham reported the incident to Human Resources.

70.     No apparent action was taken.

7

71.     Beacham was ignored by her supervisor the following week.

72.     Thereafter, Beacham was terminated.

73.     Beacham was not given any reason or cause for her termination.

74.     Eric Brooks ("Brooks") is African-American.

75.     Brooks has worked for Albertson's as an Order Selector and Salvage Worker at Albertson's Distribution Center since April 1997.

76.     Brooks is a class member in *EEOC v. Albertson's*, Civil Action No. 06-cv-01273-WYD-BNB, U.S. District Court for the District of Colorado.

77.     Brooks frequently complained to management about racist graffiti at the Distribution Center.

78.     Brooks recently retained private counsel to represent his interests in the aforementioned litigation arising out of his employment with Albertson's.

79.     On or about February 23, 2008, Brooks' attorney e-mailed all counsel of record in the aforementioned litigation advising them of said representation.

80.     Approximately four days later, Brooks' supervisor, Hayes, assigned Brooks to perform not only his normal duties but some of those of a White co-worker, Denise Nash ("Nash"), as well.

81.     Brooks had never previously been assigned his co-worker's duties in addition to his own.

82.     Upon information and belief, Nash has not engaged in protected activity.

83.     At or about the same time, Brooks for the first time learned that he has for some unknown period of time been earning $2.00 per hour less than Nash.

8

84.    Mario Cooper ("Cooper") is Black.

85.    Cooper worked for Albertson's as an Order Selector at Albertson's Distribution Center in 1996 and 1997.

86.    Cooper complained about unfair work assignments.

87.    Two weeks later, Cooper was terminated.

88.    Cooper was not given a reason for his termination.

89.    Brad Davis ("Davis") is Black.

90.    Davis has worked for Albertson's at Albertson's Distribution Center since on or about October 17, 1995.

91.    Davis complained to Supervisor Jeff Gagnon about less senior White employees being given more favorable assignments.

92.    Thereafter, Davis was given even worse assignments.

93.    Arden Glenn "Pete" Dennis ("P. Dennis") is African-American.

94.    P. Dennis has worked for Albertson's as an Order Selector, Forklift Operator and Foreperson at Albertson's Distribution Center since 1990.

95.    P. Dennis frequently complained to management about racist graffiti at the Distribution Center.

96.    Sometime in the 1994 to 1996 time period, P. Dennis applied for a promotion to the position of Foreperson.

97.    P. Dennis was qualified for the position of Foreperson.

98.    Albertson's instead gave the promotion to a White co-worker.

99.    Upon information and belief, the White co-worker had not engaged in protected

activity.

100.    Sometime in the 1997 to 2000 time period, P. Dennis again applied for a promotion to the position of Foreperson.

101.    P. Dennis was qualified for the position.

102.    Albertson's instead gave the promotion to a White co-worker.

103.    Upon information and belief, the White co-worker had not engaged in protected activity.

104.    In both instances, P. Dennis was at least as well qualified as the selectees to be a Foreperson.

105.    Jeremy Dennis ("J. Dennis") is Black.

106.    J. Dennis has worked for Albertson's as an Order Selector at Albertson's Distribution Center since 2000.

107.    J. Dennis was identified as a witness supporting Matt Ricks ("Ricks"), a fellow employee who filed charges of discrimination and a lawsuit against Albertson's.

108.    Thereafter, J. Dennis started getting harder orders, including "three-trippers," *i.e.*, orders requiring that he go to three different areas in the warehouse, while a White co-worker remained in one aisle.

109.    J. Dennis complained about offensive racial slurs in the workplace.

110.    Thereafter, J. Dennis was written up and denied a copy of the write-up.

111.    Luis Solis González ("Solis González") is of Mexican-Hispanic national origin.

112.    Solis González worked for Albertson's in the Maintenance Department at Albertson's Distribution Center from July 2002 until he resigned in August 2007.

10

113.    Solis González complained to management and to his foreperson about racist graffiti.

114.    Solis González complained to management and his foreperson about racist slurs which had been personally directed at him.

115.    Solis González made these complaints throughout his employment with Albertson's.

116.    Solis González complained to management and to his foreperson that he was expected to do more work and harder, more difficult work solely because of his Mexican national origin.

117.    Solis González made these complaints throughout his employment with Albertson's.

118.    Albertson's retaliated against Solis González for engaging in protected activity.

119.    The retaliation directed at Solis González included, without limitation: (a) being assigned work duties to perform alone which colleagues who had not engaged in protected activity were never assigned to do without assistance; (b) being disciplined for working beyond his normal shift hours, even though he had been instructed by his manager to complete the work; (c) being denied a transfer to the day shift, even though his seniority entitled him to the transfer; (d) having his work schedule and days off changed frequently, and often having his paid leave denied in ways not similarly imposed on co-workers who had not engaged in protected activity; and (e) having his efforts to become re-employed after he left Albertson's materially interfered with by Albertson's.

120.    Sabino Heredia ("Heredia") is Hispanic.

121.    Heredia worked for Albertson's as an Order Selector at Albertson's Distribution Center from 2003 until February 2007.

122.    Heredia complained about unfair work assignments.

123.    Thereafter, Heredia was treated even more harshly and given the hardest orders.

11

124.    David Lopez ("Lopez") is Hispanic.

125.    Lopez has worked for Albertson's as an Order Selector at Albertson's Distribution Center since 1995.

126.    Lopez complained about forklift or loader duties being assigned to less senior White employees.

127.    Thereafter, Lopez was given harder orders or assigned to a less favorable work area.

128.    Greg Martinez ("Martinez") is Hispanic.

129.    Martinez worked for Albertson's as an Order Selector at Albertson's Distribution Center from 1987 until 1998.

130.    Martinez complained about repeatedly being passed over for a promotion in favor of White employees.

131.    Thereafter, Martinez was assigned to order selecting and was no longer assigned to forklift or other preferred duties.

132.    Robert Miralez ("Miralez") is Hispanic.

133.    Miralez worked for Albertson's as an Order Selector at Albertson's Distribution Center from 1980 until 1996 or 1997.

134.    Miralez complained about unfair treatment almost daily.

135.    Thereafter, Miralez was singled out for different, especially difficult assignments.

136.    Roderick Montgomery ("Montgomery") is Black.

137.    Montgomery worked for Albertson's as an Order Selector at Albertson's Distribution Center from 1995 until 2000.

138.    Montgomery observed that when he worked nights, minorities were

12

disproportionately assigned to work in produce, which is the harder and heavier work, and more difficult to meet production standards or keep a high average.

139.    Montgomery observed that less senior White employees would be assigned easier duties, such as forklift and loading, which are supposed to be assigned by seniority.

140.    Montgomery complained about the unfair work assignments.

141.    Thereafter, Montgomery was assigned to bananas, which is heavier and more onerous work.

142.    Dale Pacheco ("Pacheco") Is Hispanic.

143.    Pacheco has worked for Albertson's at Albertson's Distribution Center since January 14, 1985.

144.    Pacheco has learned over the years that complaining does not get him anywhere and just makes his supervisor angry.

145.    Pacheco spoke with Albertson's attorneys.

146.    Since that time, Pacheco has been assigned to order select more frequently.

147.    Pacheco's previous assignment was working full-time as a loader.

148.    John Quiñones ("Quiñones") is Hispanic.

149.    Quiñones worked for Albertson's as a Driver and Supervisor Dispatcher at Albertson's Distribution Center from 1996 until 2000.

150.    Quiñones complained about an employee who made offensive racial jokes and ridiculed Blacks.

151.    Quiñones was terminated two weeks later.

152.    Christopher Rios ("Rios") is Hispanic.

153.     Rios worked for Albertson's as an Order Selector at Albertson's Distribution Center from 2003 until 2004.

154.     Rios observed that Hispanics were assigned less favorable job duties.

155.     Rios observed that Manager Jim (last name unknown) was particularly mean and disrespectful to Hispanic employees.

156.     Rios observed that when there was a shortage of forklift drivers, supervisors would hand pick White employees to drive forklift regardless of seniority.

157.     Rios observed that White employees were given better equipment to use, which made it easier for them to make their quotas.

158.     Rios and other minority employees were given less desirable equipment to use.

159.     Rios complained about mistreatment of Hispanic employees.

160.     Thereafter, Rios was given less favorable orders and was followed around the warehouse by supervisors.

161.     John Threats ("Threats") is Black and Asian.

162.     Threats worked for Albertson's as an Order Selector and Forklift Driver at Albertson's Distribution Center from 1992 until 1999.

163.     Threats observed that the employees assigned to picking bananas - the hardest and most onerous work - were almost always minorities.

164.     Threats observed that the only White employees working in the freezer area were working receiving, which was easier work than selecting.

165.     Threats observed that nearly all of the employees assigned to the easier tasks of forklift, loading, pallets, baling, candy, and cigarettes were less senior White employees.

14

166.    Threats complained about unfair job assignments.

167.    Thereafter, Threats was assigned to work in produce where the work is more difficult.

168.    Canada Turner ("Turner") is Black.

169.    Turner worked for Albertson's as an Order Selector at Albertson's Distribution Center from 2001 until 2003.

170.    Turner complained to Hayes about being sent home early while less senior White employees from another area were brought over to work overtime in Turner's area.

171.    Hayes became angry and raised his voice.

172.    Turner told Hayes that Hayes did not need to talk to him that way, and that he was not Hayes' boy.

173.    Whereupon, Hayes wrote Turner up for insubordination.

174.    Nate Valentine ("Valentine") is African-American.

175.    Valentine began working for Albertson's in Houston, Texas, in 1996.

176.    Valentine transferred to Albertson's Distribution Center in Aurora, Colorado, in June 2000.

177.    Valentine worked for Albertson's as a Warehouse Operations Supervisor at Albertson's Distribution Center in Aurora, Colorado, from June 2000 until February 2003.

178.    Valentine transferred to Albertson's Lancaster Distribution Center in Denver, Pennsylvania, in February 2003.

179.    The Lancaster Distribution Center was subsequently bought by SuperValu, Inc.

180.    Valentine is no a longer employed by Albertson's.

181.    Valentine is an Intervenor in *EEOC v. Albertson's*, Civil Action No. 06-cv-01273-

WYD-BNB, U.S. District Court for the District of Colorado.

182.    Valentine observed that minority employees who complained were especially harassed.

183.    Valentine observed that Ricks was unfairly harassed by management after complaining about discriminatory conditions.

184.    Valentine observed that a White employee similarly filed a lot of complaints and grievances.

185.    Valentine observed that the White employee was not similarly targeted for termination like Ricks.

186.    Valentine received a smaller raise than his White colleagues who had lower production numbers.

187.    Valentine did not complain because he did not want to be identified as a complainer and thereby be prevented from being promoted.

188.    Throughout his tenure at Albertson's Distribution Center in Aurora, Colorado, Valentine complained to upper management about racist and ethnic graffiti, writings and drawings he personally observed in the work place.

189.    Valentine also brought to the attention of upper management complaints about such racist and ethnic graffiti, writings and drawings which had been made to him by his subordinate employees.

190.    Albertson's retaliated against Valentine for engaging in this as well as other protected activity.

191.    Such retaliation included but was not limited to: (a) although Valentine had been told

he was to be assigned to the day shift when he transferred to Albertson's Aurora, Colorado, Distribution Center, within four months after his arrival Valentine was assigned to the less-desirable night shift; (b) Valentine was paid less than other Warehouse Supervisors who performed the same job functions and who had not engaged in protected activity; (c) Valentine was given smaller pay raises than other Warehouse Supervisors who had not engaged in protected activity, even though Valentine's work performance was superior to most if not all of the other Supervisors; (d) alone among all Warehouse Supervisors and Managers, Valentine was not permitted to have two consecutive days off in a work week; (e) Warehouse Operations Manager James Hartley ("Hartley") repeatedly took steps to isolate Valentine professionally from his supervisory co-workers; and (f) Hartley repeatedly spoke down to and attempted to humiliate Valentine in front of his subordinate employees.

192.    Hartley is White.

193.    Hartley worked for Albertson's at Albertson's Distribution Center from October 1, 1982, until January 2007.

194.    Hartley was first hired as an Order Selector.

195.    In approximately 1985, Hartley was promoted to Working Foreman.

196.    In approximately 1989, Hartley was promoted to Warehouse Operations Supervisor.

197.    In approximately 1993, Hartley was promoted to Warehouse Operations Superintendent.

198.    From 1993 through September 1996, Hartley opened Distribution Centers for Albertson's in Tolleson, Arizona, and Plant City, Florida.

199.    Hartley's title while in Tolleson, Arizona, was Warehouse Operations Supervisor.

17

200.    Hartley's title while in Plant City, Florida, was Warehouse Operations Superintendent.

201.    Hartley returned to the Distribution Center in Aurora, Colorado, towards the end of 1996.

202.    In 1999 or 2000, Hartley was promoted to Warehouse Operations Manager.

203.    On or about July 14, 2005, Leslie Chapman ("Chapman"), Human Resources Supervisor, called Hartley off the warehouse floor into a meeting with her and Miller in Miller's office.

204.    Once Hartley was in Miller's office, Miller started talking about ethnicity, blood lines and heritage.

205.    Miller engaged Hartley in a discussion of Hartley's blood line and history.

206.    Miller commented that it would be in the best interest of the company in regard to the pending Ricks and Cortes EEOC charges if Hartley's ethnic background was that of a minority.

207.    Hartley told Miller and Chapman that he had Filipino, German, Irish and Indian blood.

208.    Whereupon, Miller responded that it would be better, since Hartley had Indian blood, if Hartley designated himself as Native American.

209.    Hartley asked Miller why it would be better.

210.    Miller responded because that was Ricks' ethnicity.

211.    Up until this time, Hartley had always self-identified his race or ethnicity as White.

212.    In the meeting with Miller and Chapman, Hartley agreed to change the designation of his ethnicity to Native American.

18

213.    Hartley told Chapman to go ahead and change it.

214.    Chapman responded that Hartley had to send her an e-mail.

215.    Hartley was instructed by Miller and Chapman to take care of it right away.

216.    Whereupon, the meeting concluded and Hartley went immediately to his office and sent Chapman an e-mail stating, "I would like to change my ethnic heritage from white to Indian based on the fact that I have a higher percentage of Indian blood than any other type.  Thanks."

217.    On or about June 16, 2005, 28 days before Hartley's meeting with Miller and Chapman, Albertson's submitted a position statement in response to Cortes' EEOC Charge Number E20050591 which identified Hartley as Caucasian.

218.    On or about July 18, 2005, 4 days after Hartley's meeting with Miller and Chapman, Albertson's submitted a position statement in response to Ricks' EEOC Charge Numbers 320-2004-01187 and 320-2004-02530 which identified Hartley as Native American.

219.    Ricks self-identifies his race as Black.

220.    Ricks' mother was born on a Flathead Indian Reservation in Montana.

221.    A couple of days after Hartley's July 14, 2005, meeting with Miller and Chapman in Miller's office, Hartley had another conversation with Miller in Miller's office about Hartley's ethnicity.

222.    Hartley told Miller that Hartley did not feel right about changing the designation of his ethnicity.

223.    Hartley told Miller that if the EEOC called Hartley and asked him what his ethnicity was, Hartley would tell the EEOC that he was White, that he was asked to change the designation of his ethnicity, and that he had historically identified himself as White.

19

224.    Effective October 23, 2005, Hartley was demoted to Transportation Superintendent supposedly because of lack of enthusiasm and low energy.

225.    Hartley received regular performance evaluations and reviews up until the time of his demotion.

226.    None of those performance evaluations and reviews mentioned or discussed any concerns or problems with Hartley's productivity.

227.    None of those performance evaluations and reviews alerted Hartley to an issue regarding enthusiasm or energy level.

228.    Hartley had no previous experience in transportation.

229.    Despite his lack of experience, Hartley did his best to learn and perform the duties and responsibilities of his new position.

230.    Hartley resigned on January 17, 2007.

231.    Cortes and other class members were given less desirable work assignments because of their opposition to Albertson's discriminatory practices.

232.    Cortes and other class members were denied transfers because of their opposition to Albertson's discriminatory practices.

233.    Cortes and other class members were disciplined because of their opposition to Albertson's discriminatory practices.

234.    Cortes and others class members were discharged because of their opposition to Albertson's discriminatory practices.

235.    The retaliation continues to this day.

**Claim for Relief: Class Claim of Retaliation**

236.    Plaintiff EEOC hereby reallages, reasserts, and incorporates ¶¶ 1-235 with the same force and effect as if fully set forth herein.

237.    Since at least 1995, Albertson's has engaged in unlawful employment practices at its Distribution Center in Aurora, Colorado, in violation of §§ 704, 706(f)(1), 706(f)(3), and 707 of Title VII, 42 U.S.C. §§ 2000e-3, 2000e-5(f)(1), 2000e-5(f)(3), and 2000e-6, and § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, by engaging in a pattern or practice of retaliation against Cortes and a class of Distribution Center employees by subjecting them to retaliation, including but not limited to, disparate terms and conditions of employment, denials of transfers, harassment, disciplinary actions, demotions, and discharges for opposing Albertson's unlawful discriminatory employment practices.

238.    The effect of the practices complained of in ¶¶ 12-235 above has been to deprive Cortes and a class of Distribution Center employees of equal employment opportunities and otherwise adversely affect their status as employees because of their opposition to Albertson's discriminatory practices.

239.    During their employment with Albertson's, Cortes and a class of Distribution Center employees engaged in protected activity under § 704(a) of Title VII, 42 U.S.C. § 2000e-4(a), by opposing unlawful discriminatory and retaliatory employment practices at Albertson's Distribution Center.

240.    Albertson's, acting through its managers and supervisors, retaliated against Cortes and a class of Distribution Center employees because of their protected activity.

241.    As a result of Albertson's unlawful retaliation, Cortes and a class of Distribution

21

Center employees have suffered damages, including but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in amounts subject to proof.

242.    The unlawful employment practices complained of in ¶¶ 12-235 above were and are intentional.

243.    The unlawful employment practices complained of in ¶¶ 12-235 above were and are done with malice or with reckless indifference to the federally protected rights of Cortes and a class of Distribution Center employees.

### PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Albertson's, its officers, successors, assigns, and all persons in active concert or participation with them, from engaging in any pattern or practice of retaliation and/or any other employment practice for opposing unlawful discriminatory employment practices.

B.    Order Albertson's to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees and which eradicate the effects of its past and present unlawful employment practices, including retaliation.

C.    Order Albertson's to make whole Cortes and a class of Distribution Center employees by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above.

D.    Order Albertson's to make whole Cortes and a class of Distribution Center employees by providing compensation for past and future nonpecuniary losses resulting from the unlawful

employment practices described above, including but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

      E.      Order Albertson's to pay to Cortes and a class of Distribution Center employees punitive damages for Albertson's malicious and reckless conduct described above.

      F.      Order Albertson's and its successors to provide training to its officers, managers, and employees regarding retaliation in the workplace.

      G.      Grant such further relief as the Court deems necessary and proper in the public interest.

      H.      Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by this Complaint.

Dated: March 28, 2008.

Respectfully submitted:


JAMES L. LEE
Deputy General Counsel

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
1801 L Street, N.W.
Washington, D.C.  20507

MARY JO O'NEILL
Regional Attorney
Phoenix District Office

RITA BYRNES KITTLE
Supervisory Trial Attorney
EEOC Denver Field Office
303 E. 17th Ave., Suite 410
Denver, CO 80203
(303) 866-1347
Rita.Kittle@eeocc.gov

s/ D. Andrew Winston
Trial Attorney
(303) 866-1361
Andrew.Winston@eeoc.gov

NANCY L. WEEKS
Trial Attorney
(303) 866-1947
Nancy.Weeks@eeoc.gov

**PLEASE NOTE:**
**For purposes of service upon the EEOC,**
**it is sufficient that pleadings, notices, and**
**court documents be served upon the**
**Trial Attorneys.**